~~SEALED~~

# United States District Court

## SOUTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA

v.

IRENE VASQUEZ-RAMOS,
BRENDA MAGANAS,
SERGIO MARCOS, and
ELIZABETH ALONDRA MARCOS

### CRIMINAL COMPLAINT

CASE NUMBER: 1:16-mj-00142-DKL
-01
-02
-03
-04

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

On or about July 2015 through on or about February 19, 2016, in the Southern District of Indiana, defendants Irene Vasquez-Ramos, Brenda Maganas, Sergio Marcos, and Elizabeth Alondra Marcos did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II, Non-Narcotic Controlled Substance in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(viii).

I further state that I am a Special Agent with the Drug Enforcement Agency, and that this complaint is based on the following facts:

See attached Affidavit

**Continued on the attached sheet and made a part hereof.**

_____
Philip McCormick, Special Agent
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence

February 19, 2016
**Date**

at    Indianapolis, Indiana

Denise K. LaRue, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

_____
**Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF APPLICATION

This affiant, Philip McCormick, Special Agent, U.S. Department of Justice, Drug Enforcement Administration (DEA), being duly sworn under oath states as follows:

### I.      AGENT BACKGROUND

1.      I have been employed as a DEA Special Agent since February 2004.  I was temporarily assigned to the Indianapolis Resident Office and then permanently assigned to the Chicago Field Division from 2004 until 2015.  I was then transferred to the Indianapolis District Office and have been here since December 2015.  In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to Title 21, U.S.C., Sections 841, 843, 846, and 848.  I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code.  I have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and of the laundering and concealing of proceeds from drug trafficking in violation of Title 18, U.S.C., Sections 1956 and 1957.  I have received training in investigations involving transporting and distributing of narcotics.

2.      I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code (U.S.C.), Section 2516.

3.      I have participated in the ongoing investigation conducted by the DEA Indianapolis, Enforcement Group 51 and the United Drug Task Force (UDTF), and the Indianapolis Metropolitan Drug Task Force (IMDTF) concerning the narcotics trafficking of

IRENE VASQUEZ-RAMOS, her narcotics sources, distributors, couriers and narcotics customers in the Indianapolis area and throughout the United States. As part of the investigatory team, among other things, I monitored electronic devices pursuant to this Court's orders, and conducted surveillance as part of the investigation.

4. The statements contained in this Affidavit are based on: (a) my personal participation in this investigation; (b) information provided by other federal, state, and local law enforcement officers; (c) surveillance conducted by DEA agents and other law enforcement officers; (d) analyses of toll records and subscriber information; (e) information derived from consensually-recorded telephone conversations; (f) my training and experience and the training and experience of other law enforcement agents; (g) laboratory analysis reports; (h) reports of telephone records; (i) commercial database records; (j) public records, and; (k) information provided by confidential informants (CIs) and other individuals.

5. This affidavit is submitted in support of a Complaint charging **IRENE VASQUEZ-RAMOS, BRENDA MAGANAS, SERGIO MARCOS**, and **ELIZABETH ALONDRA MARCOS** as follows:

a. From on or about July 2015 through on or about February 19, 2016, in the Southern District of Indiana and elsewhere, **IRENE VASQUEZ-RAMOS, BRENDA MAGANAS, SERGIO MARCOS,** and **ELIZABETH ALONDRA MARCOS**, did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Non-Narcotic Controlled Substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A)(viii).

6. The recitation of facts contained in this Affidavit is not meant to be a complete

narrative of all that has occurred in connection with this investigation, but is only a summary of facts necessary to show probable cause to support the charges as set forth herein. Likewise, consensually recorded conversations provided herein are excerpts and do not constitute all of the pertinent communications intercepted throughout this investigation.

## II.   STATUTORY AUTHORITY

7.     This investigation concerns alleged violations of Title 21, United States Code, Sections 841(a)(1) and 846:

a.   21 U.S.C. § 841(a)(1) prohibits any person from manufacturing, distributing, or dispensing, or possessing with the intent to manufacture, distribute, or dispense, a controlled substance;

b.   21 U.S.C. § 846 prohibits any person from conspiring to manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute, or dispense, a controlled substance.

## III.   <u>ROLES OF THE DEFENDANTS</u>

8.     Irene VASQUEZ-RAMOS (hereinafter "VASQUEZ-RAMOS") is the leader of a drug trafficking organization (DTO) based in Indianapolis, Indiana. From beginning no later than in or about July 2015 and continuing until at least February 19, 2016, the VASQUEZ-RAMOS DTO obtained large quantities of methamphetamine from suppliers not yet identified, and distributed the methamphetamine to its customers.

a.   As leader of the DTO, VASQUEZ-RAMOS, in summary: 1) negotiated directly and through other members of the DTO, with suppliers yet to be identified, to obtain ounce and pound quantities of methamphetamine; 2) distributed and supervised the distribution of narcotics from workers and customers of the DTO;

3

3) collected and supervised the collection of narcotics proceeds and customers of the DTO; 4) stored and arranged for workers of the DTO to prepare and store narcotics at various locations.

9.      Brenda MAGANAS (hereinafter MAGANAS) coordinated narcotics transactions for VASQUEZ-RAMOS.

10.      Elizabeth Alondra MARCOS (hereinafter referred to as E. MARCOS) coordinated and conducted narcotics transactions for VASQUEZ-RAMOS.

11.      Sergio "Tony" MARCOS (hereinafter referred to as S. MARCOS) coordinated and conducted narcotics transactions for VASQUEZ-RAMOS.

## IV.      FACTS ESTABLISHING PROBABLE CAUSE

12.      This Affidavit is based on an investigation conducted by DEA and UDTF into the drug trafficking and related criminal activities involving Irene VASQUEZ-RAMOS, her co-conspirators and distributors.

### A.      Controlled Buys of Methamphetamine from the VASQUEZ-RAMOS DTO

13.      Between July 2015 and September 2015, the UDTF and DEA Indianapolis, Enforcement Group 51 conducted an investigation which resulted in the arrest of a Confidential Source (CS) as related to the investigation of methamphetamine distribution.

14.      The CS agreed to cooperate with law enforcement in hopes of avoiding criminal charges, or alternatively, for prosecutorial and/or judicial leniency if charges are filed.  No charges have been filed to date against CS #1 and CS #1 has no prior criminal convictions.  It is my belief that CS #1 is credible and reliable because (1) he/she provided information that incriminated himself/herself in the possession of illegal drugs; (2) much, but not all of the information provided by the CS has been corroborated by my independent investigation,

4

including records reviewed and received, surveillance and witness interviews; and (3) he/she successfully purchased illegal drugs at the direction of law enforcement, as discussed below.

15.     The CS identified the following individuals as narcotics and/or money courier targets within the VASQUEZ-RAMOS DTO: **IRENE VASQUEZ-RAMOS ("VASQUEZ-RAMOS"), BRENDA MAGANAS ("MAGANAS"), SERGIO MARCOS ("S. MARCOS"), and ELIZABETH MARCOS ("E. MARCOS")**.    The CS provided intelligence that VASQUEZ-RAMOS is the leader of the DTO and is dealing methamphetamine in the Southern District of Indiana and elsewhere.

**(i)     Controlled buys of methamphetamine from VASQUEZ-RAMOS at the West 15th Residence**

16.     On September 10, 2015, at approximately 5:30 PM, Agents and Officers met with the CS to make a controlled purchase of approximately one ounce of methamphetamine from VASQUEZ-RAMOS at her residence located at 6440 W. 15th Street, Indianapolis, Indiana (hereinafter, the "West 15th Street Residence").[1]

17.     At approximately 5:51 PM, at the direction of Agents/Officers, the CS sent a text message to telephone number 317-200-9613, identified by the CS to be VASQUEZ-RAMOS' cellular telephone number (hereinafter, "VASQUEZ-RAMOS PHONE 1"), asking for an ounce

---

[1] During each of these controlled buys described herein, numerous controls were in place to maintain the integrity of the evidence collected. In each buy, unless noted herein, the purchases were preceded by consensually monitored and recorded phone calls (or text messages) between the confidential source and the target from whom the buy was conducted. Prior to each purchase, the confidential source and any vehicle he/she utilized were searched for contraband and money, with negative results. On each buy, the confidential source was outfitted with a device which recorded all conversations that the confidential source had while wearing the device, and was also given the appropriate amount of U.S. Currency required to make the planned controlled buy. The confidential source was followed by law enforcement to and from the controlled buys described. After the controlled purchases described, the confidential source was followed to a debrief location, at which point the confidential source handed over the controlled substances purchased and was again searched for contraband/money, with negative results. Anywhere that I have indicated crystal methamphetamine was purchased, the purchased substance was analyzed by a forensic chemist and confirmed to be crystal methamphetamine.

(referring to an ounce of methamphetamine). At approximately 5:57 PM, VASQUEZ-RAMOS responded with the text "ok". At approximately 5:58 PM, the CS sent a text that he/she was on the way and VASQUEZ-RAMOS responded that she was on the way home. At approximately 6:17 PM, the CS sent a text to VASQUEZ-RAMOS that he/she was almost there. At approximately 6:18 PM, agents and officers observed VASQUEZ-RAMOS exit a 2009 Dark Blue Chevy Malibu, Indiana license plate #RK1551 and enter the West 15th Street Residence. A records check revealed that 2009 dark blue Chevy Malibu, bearing Indiana license plate #RK1551 is registered to MAGANAS (the girlfriend of VASQUEZ-RAMOS) at the West 15th Street Residence. At approximately 6:19 PM, the CS received a text message from VASQUEZ-RAMOS stating that she was home.

18. At approximately 6:21 PM, Detectives searched the CS and CS vehicle (CSV) for contraband with negative results. The CS was equipped with a video/audio recording device and provided with $800.00 of DEA Official Advanced Funds (OAF). At approximately 6:26 PM, the CS departed the area under constant surveillance. At approximately 6:31 PM, officers observed the CS exit the CSV and enter the front door to the West 15th Street Residence. At approximately 6:45 PM, officers observed the CS exit the West 15th Street Residence and enter the CSV and depart the area. At this time, Agents and Officers maintained surveillance of the CS and CSV to a pre-determined location.

19. The CS gave agents and officers a clear plastic bag containing a white powdery substance, later determined to be approximately 28.16 grams suspect methamphetamine. The methamphetamine was transported to the Indianapolis Metropolitan Police Department (IMPD) Property Room for safekeeping and analysis. Agents and officers searched the CS and CS vehicle for contraband with negative results and retrieved the audio/video recording device and

secured it for processing.

20.     At approximately 6:55 PM, agents and officers debriefed the CS.  The following is a summary of the events from the controlled buy:  The CS stated that he/she met with VASQUEZ-RAMOS in the living room where he/she handed VASQUEZ-RAMOS the $800 OAF.  VASQUEZ-RAMOS reached into a backpack sitting by the couch and retrieved a clear plastic bag containing the methamphetamine and handed it to the CS. The CS stated that he/she observed at least three more clear plastic bags containing a similar amount of powder inside the backpack.  The CS stated that two other females were in the room during the transaction, VASQUEZ-RAMOS' girlfriend MAGANAS, and MAGANAS' daughter E. MARCOS.

21.     Law enforcement reviewed the audio/video recording device on the CS, which corroborated the CS' description of the transaction.

22.     The CS conducted additional controlled buys from VASQUEZ-RAMOS at the West 15th Street Residence on September 17, 2015 (29.05 grams of methamphetamine) and October 14, 2015 (29.1 grams of methamphetamine).  MAGANAS and E. MARCOS were present during the exchange of drugs and money on October 14, 2015.

> **(ii)     *Controlled buy of methamphetamine from VASQUEZ-RAMOS relating to the Windham Lake Residence***

23.     On Tuesday, December 8, 2015, at approximately 10:30 AM, Agents and Officers from DEA Group #51 and Detectives from UDTF met with the CS to make a controlled purchase of approximately one ounce of methamphetamine from VASQUEZ-RAMOS.  The CS stated that VASQUEZ-RAMOS agreed to sell an ounce of methamphetamine for $800.00 to the CS on

Monday (12/7/15) or Tuesday (12/8/15), which law enforcement confirmed by reviewing the text messages.

24.    The CS could not get a hold of VASQUEZ-RAMOS but still went to the West 15th Street Residence.  Law enforcement had provided the CS with an audio/video recording device.  The CS was let inside the residence, where he/she met with MAGANAS and E. MARCOS, who told the CS that VASQUEZ-RAMOS was not home.  The CS stated there was also a small child and an older female that was MAGANAS' mother.  The CS told E. MARCOS that he/she was supposed to pick up the ounce today but hadn't heard back from VASQUEZ-RAMOS.  At this time, MAGANAS made contact with VASQUEZ-RAMOS via telephone and told the CS that VASQUEZ-RAMOS would meet the CS later tonight with the ounce.  E. MARCOS told the CS that they had moved all the dope out of the house so grandma wouldn't see it.  MAGANAS told the CS that VASQUEZ-RAMOS would call him/her later tonight when she was ready.  At this time the CS departed the residence.   Law enforcement reviewed the audio/video recording device, which corroborated the CS' statement.

25.    Agents and Officers conducted surveillance on VASQUEZ-RAMOS that afternoon.  At approximately 5:45 PM, detectives observed VASQUEZ-RAMOS driving the previously identified blue Malibu parking in the driveway of 8118 Windham Lake Way, Indianapolis, Indiana (the "Windham Lake Residence").  At this time, detectives observed VASQUEZ-RAMOS exit the Malibu and enter the residence above.  Open source research shows that Windham Lake Residence is associated with an individual named Deyna REYES, who also has utility bills registered in her name for the VASQUEZ-RAMOS residence located at the West 15th Street Residence.

26.     At approximately 6:00 PM, detectives observed VASQUEZ-RAMOS exit the residence and enter the blue Malibu. At this time, detectives observed Deyna REYES exit the residence and enter a 2013 Orange Chevy Sonic, bearing Indiana license plate #476ABR, that was parked in the driveway next to the blue Malibu, drive around the block, return to the residence and briefly park next to VASQUEZ-RAMOS and engage in conversation. At approximately 6:02 PM, detectives observed VASQUEZ-RAMOS depart the area in the blue Malibu, while REYES remained inside the Orange Chevy Sonic, in the driveway of the residence.

27.     At approximately 6:05 PM, agents and officers met with the CS at a pre-determined location. At this time, the CS and CSV were searched for contraband with negative results. The CS was equipped the CS with a video/audio recording device.

28.     At approximately 6:10 PM, the CS received a call from VASQUEZ-RAMOS in which she tells the CS to meet her at a certain apartment complex in Indianapolis, Indiana. At approximately 6:13 PM, the CS departed the area followed by constant surveillance. The CS stopped at a pre-determined location where he/she was provided by agents and officers with $800.00 of DEA Official Advanced Funds (OAF). At approximately 6:21 PM, detectives observed the blue Malibu entering the apartment complex parking lot. At approximately 6:25 PM, detectives observed the CSV enter the same apartment complex parking lot. At this time, detectives observed the CS exit the CSV, approach the blue Malibu and engage in conversation with VASQUEZ-RAMOS. At approximately 6:30 PM, detectives observed the blue Malibu depart the area. At approximately 6:32 PM, agents and officers searched the CS and CSV for contraband with negative results. Agents and officers retrieved the audio/video recording device and secured it for processing.

9

29.     At this time, the CS gave detectives a clear plastic bag containing a white crystal substance, later determined to be approximately 33.5 grams of methamphetamine.  Agents and officers conducted a debriefing of the CS and the following is a summary of the events from the controlled buy:  The CS stated that he/she met with VASQUEZ-RAMOS at her car (blue Malibu) in the parking lot.  The CS gave VASQUEZ-RAMOS the $800.00 and VASQUEZ-RAMOS gave the CS a clear plastic bag with a white crystal substance.  The CS stated that he/she told VASQUEZ-RAMOS that the CS had a new customer for methamphetamine needing big weight.  The CS asked if VASQUEZ-RAMOS could provide a "QP" (quarter pound-4 ounces) of methamphetamine next week to which VASQUEZ-RAMOS stated yes.

   *(iii)*     ***Controlled buy of methamphetamine from E. MARCOS at the West 15th Street Residence***

30.     On January 13, 2015, Agents and Officers from the DEA Group #51 and Detectives from UDTF met with the CS make a controlled purchase of two ounces of methamphetamine from VASQUEZ-RAMOS at the West 15th Street Residence.

31.     On January 13, 2016, the DEA arranged for the CS to purchase methamphetamine from VASQUEZ-RAMOS.  The CS communicated with VASQUEZ-RAMOS for the purchase of two ounces of methamphetamine.  VASQUEZ-RAMOS agreed to provide the two ounces and instructed the CS to come to VASQUEZ-RAMOS' residence at 7:00pm.  Law enforcement reviewed those communications with corroborated the CS' statement.

32.     On January 13, 2016, Agents and Officers established surveillance on VASQUEZ-RAMOS and observed her enter the West 15th Street Residence at approximately 5:45 PM.

33.     At approximately 6:58 PM, agents and officers met with the CS.  The CS and CSV were searched for contraband with negative results.  At this time, detectives equipped the

CS with a video/audio recording device and gave the CS $1600.00 of DEA Official Advanced Funds (OAF).

34.     At approximately 7:15 PM, the CS departed the area under constant surveillance. At approximately 7:18 PM, agents and officers observed the CS exit the CSV and enter the front door to the residence located at 6440 W. 15th Street, Indianapolis, Indiana. At approximately 7:21 PM, agents and officers observed the CS exit the residence, enter the CSV and depart the area. At this time, Agents and Officers maintained surveillance of the CS and the CSV to a pre-determined location.

35.     At approximately 7:24 PM, the CS gave detectives a clear plastic Ziploc bag of a white crystal substance, later determined to be approximately 60.82 grams of methamphetamine. The methamphetamine was transported to the Indianapolis Metropolitan Police Department (IMPD) Property Room for safekeeping and analysis.

36.     At approximately 7:25 PM, the CS and CSV were searched for contraband with negative results. Law enforcement retrieved the audio/video recording device, secured it for processing and conducted a CS debriefing.

37.     The CS stated that he/she parked in front of the VASQUEZ-RAMOS, knocked on the front door and was let inside the house by a subject later identified as E. MARCOS, who was holding an infant baby. E. MARCOS told the CS that VASQUEZ-RAMOS and S. MARCOS were both already sleeping and E. MARCOS did not want to wake them up. E. MARCOS then handed the CS a clear plastic Ziploc bag, containing the suspected methamphetamine and the CS gave E. MARCOS the $1600.00. E. MARCOS was holding the infant baby throughout the transaction.

*(iv)*   ***Controlled buys of methamphetamine from S. MARCOS at the West 15th Street Residence***

38.     On January 28, 2016, VASQUEZ-RAMOS communicated with the CS, instructing the CS to come to VASQUEZ-RAMOS' residence around 8 o'clock p.m.  The CS told VASQUEZ-RAMOS that he/she would be unable to go at that time but can come to the residence around noon the next day, January 29, 2016.

39.     On January 29, 2016, DEA conducted surveillance on VASQUEZ-RAMOS. VASQUEZ-RAMOS drove to her place of employment and then the West 15th Street Residence sometime prior to noon.  VASQUEZ-RAMOS then entered her vehicle and left the residence.  S. MARCOS called CS on a few occasions and told the CS to come by the residence around noon.

40.     The CS arrived at the West 15th Street Residence around noon on January 29, 2016.  Prior to arriving at the residence, Special Agents and Task Force Officers with the DEA met with the CS and searched the CS and his/her vehicle for contraband with negative results. Special Agents and Task Force Officers gave CS a video/audio recording device and $1,600 DEA Official Advanced Funds (OAF).

41.     At approximately 12:08pm, agents/task force officers observed the CS arrive at 6440 W. 15th Street, Indianapolis, Indiana.  They observed the CS knock on front door and observed that the CS was let inside.  At approximately 12:15pm, they observed the CS exit the residence with S. MARCOS and go to the rear of the CS's vehicle.  Law enforcement then saw the CS enter his/her vehicle.  Law enforcement maintained surveillance on the CS's vehicle to a pre-determined location. The CS immediately handed detectives a clear plastic Ziploc bag containing suspected methamphetamine.  The substance field tested positive for methamphetamine and weighed approximately 57.2 grams.  Law enforcement searched the CS and the CS's vehicle for any contraband or currency with negative results.

42.     The CS provided a statement to the detectives following the transaction and generally stated the following:  S. MARCOS met the CS at the door and let him/her into the residence.  E. MARCOS, E. MARCOS' minor child, and S. MARCOS' minor child were also present in the residence.  The CS stated that S. MARCOS took the CS into the family room where he weighed the methamphetamine for the CS, which amounted to approximately 2 ounces. The CS stated that the methamphetamine was already packaged at the time S. MARCOS handed it to him/her.  The CS paid S. MARCOS approximately $1,600 for the 2 ounces of methamphetamine.

43.     Agents and officers have reviewed the audio/video recording, which corroborates the CS's account of the transaction.

44.     On Monday, February 15, 2016, the DEA arranged for the CS to purchase methamphetamine from VASQUEZ-RAMOS.  In communications between the CS and VASQUEZ-RAMOS, VASQUEZ-RAMOS agreed to sell four ounces of methamphetamine for $3000.00 to the CS at around noon on Tuesday, February 16, 2016.  Law enforcement reviewed the communications between the CS and VASQUEZ-RAMOS, which corroborated the CS' account of the conversation.

45.     On February 16, 2016, Agents and Officers from DEA Group #51 and Detectives from UDTF met with the CS to make a controlled purchase of four ounces of methamphetamine from VASQUEZ-RAMOS at the West 15th Street Residence.

46.     At approximately 11:35 AM, the CS arrived at a pre-determined meet location.  At approximately 11:45 AM, the CS and CSV were searched for contraband with negative results.  At approximately 12:41 PM, agents and officers equipped the CS with a

video/audio recording device and gave the CS $3000.00 of DEA Official Advanced Funds (OAF).

47.    At approximately 12:15 PM, the CS received a call from S. MARCOS from telephone number 317-331-0800 during which S. MARCOS asked the CS if the CS could take him to his mechanic and pick up his car.

48.    At approximately 12:43 PM, the CS departed the area under constant surveillance. At approximately 12:49 PM, agents and officers observed the CS exit the CSV and enter the front door to the West 15th Street Residence. At approximately 12:53 PM, agents and officers observed the CS exit the West 15th Street Residence. At approximately 12:54 PM, agents and officers observed the CS depart the area. At this time, Agents and Officers maintained surveillance of the CS and CSV to a pre-determined location.

49.    At approximately 1:00 PM, agents and officers retrieved the audio/video recording device and secured it for processing. At this time, the CS gave the agents/officers a clear plastic bag containing a white crystal substance, of approximately 111.5 grams of a white crystal substance later determined to be methamphetamine. Agents and officers searched the CS and CSV for contraband with negative results. Agents and officers conducted a debriefing of the CS and the following is a summary of the events from the controlled buy:

50.    The CS stated that he/she parked in front of the West 15th Street Residence, knocked on the front door and was let inside the house. The CS was met by S. MARCOS and led into the kitchen where S. MARCOS retrieved a plastic bag from the silverware drawer and handed the CS the clear plastic bag with a white crystal substance. The CS weighed the white crystal substance on a digital scale that was sitting on the table. The CS then gave S. MARCOS the $3000.00, which S. MARCOS counted to confirm the amount.

51.     The CS told S. MARCOS that he/she had a customer who would need a half pound of methamphetamine in a few days. S. MARCOS told the CS that "they" (VASQUEZ-RAMOS DTO) had plenty and that would not be a problem.

**B.  The Execution of Search Warrants**

52.     On February 17, 2016, the Honorable Denise K. LaRue, United States Magistrate Judge, issued federal search warrants authorizing the search of the West 15th Street Residence and the Windham Lake Residence. Those search warrants were executed on February 19, 2016.

53.     MAGANAS and E. MARCOS were present at the West 15th Street Residence during the execution of the search warrant. MAGANAS and E. MARCOS were read their rights pursuant to *Miranda v. Arizona*. MAGANAS requested an attorney. E. MARCOS agreed to speak with law enforcement. She generally stated that she was aware that VASQUEZ-RAMOS and MAGANAS have been involved in drug distribution. E. MARCOS acknowledged providing drugs to customers on several occasions. E. MARCOS also acknowledged wiring money at the request of VASQUEZ-RAMOS.

54.     Law enforcement located over five pounds (2623 grams) of a white crystal substance in the garage of the West 15th Street Residence, which field tested positive for methamphetamine. Law enforcement also located a scale on the kitchen. Approximately $8,000 in cash was located in VASQUEZ-RAMOS' and MAGANAS' bedroom under the bed in a rubber band. Identification and paperwork associated with VASQUEZ-RAMOS and MAGANAS' was located in their bedroom as well. In S. MARCOS' bedroom, law enforcement located 9 mm rounds of ammunition and shotgun shells.

55.     VASQUEZ-RAMOS was not present at the West 15th Street Residence during the execution of the search warrant. Law enforcement conducted a traffic stop of VASQUEZ-

RAMOS.  VASQUEZ-RAMOS agreed to be interviewed and signed a waiver of her rights pursuant to *Miranda v. Arizona*.  VASQUEZ-RAMOS generally stated that she stores methamphetamine in her garage for an individual named "Guerro."  She stated that Guerro places the drugs in the garage and takes it when he needs it.  VASQUEZ-RAMOS stated that she has done this between three and five times for "Guerro" and that he normally stores ten to fifteen pounds in her garage.  VASQUEZ-RAMOS stated that she gets paid approximately $500 - $1000 for storing the drugs.  VASQUEZ-RAMOS also stated that she has dealt about a half ounce of methamphetamine on three or four occasions, and that she charges $400-$500 dollars and makes about $100.  VASQUEZ-RAMOS stated that "Guerro" most recently placed drugs in the garage approximately two weeks ago and she is not sure how much in in there but knows that it is methamphetamine.

56.     S. MARCOS was also not present at the West 15th Street Residence during the execution of the search warrant.  Law enforcement conducted a traffic stop of S. MARCOS.  S. MARCOS.  S. MARCOS was read his rights pursuant to *Miranda v. Arizona* and requested an attorney.

## V.     CONCLUSION

57.     Based upon your my training and experience and the facts set forth herein, I submit that probable cause exists for the arrest of **IRENE VASQUEZ-RAMOS, BRENDA MAGANAS, SERGIO MARCOS,** and **ELIZABETH ALONDRA MARCOS** for the following:

a.  From on or about July 2015 through on or about February 19, 2016, in the Southern District of Indiana and elsewhere, **IRENE VASQUEZ-RAMOS, BRENDA MAGANAS, SERGIO MARCOS,** and **ELIZABETH ALONDRA MARCOS**, did conspire

16

with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Non-Narcotic Controlled Substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A)(viii).

58.     I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this affidavit.  I believe that sealing this document is necessary because the information gathered is relevant to an on-going investigation into criminal activity, the entire extent of which is not known at this time.  Based upon my training and experience, and information I have received from other law enforcement agents, I know that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, i.e., post them publicly on-line through different forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Philip McCormick, Special Agent
Drug Enforcement Administration


Subscribed and sworn before me this 19th day of February, 2016.

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

17